

BOSTON   CONNECTICUT   FLORIDA   NEW JERSEY   NEW YORK   PROVIDENCE   WASHINGTON, DC

**MARK SALAH MORGAN**
Attorney at Law

One Jefferson Road
Parsippany, NJ 07054-2891
T: (973) 966-8067 F: (973) 206-6692
mmorgan@daypitney.com

July 6, 2023

**VIA ECF**
Honorable Claire C. Cecchi, U.S.D.J.
United States District Court
District of New Jersey
Martin Luther King Fed. Bldg. & U.S. Courthouse
50 Walnut St.
Newark, NJ  07101

   Re: *New England Petroleum Limited Partnership v. Daibes Oil, LLC, et al.*
     *Civil Action No. 2:14-cv-00726-CCC-JBC*

Dear Judge Cecchi:

  As Your Honor is aware, this office represents Plaintiff New England Petroleum Limited Partnership ("NEP").  In view of several recent developments, we again write to request that the Court schedule an in-person status conference to address this matter, including the scheduling of a new trial date, as soon as possible.

  The serial delays of this trial have severely prejudiced NEP.  This case has been pending since February 2014 (ECF Doc. No. 1) and has been trial ready since May 16, 2019 (ECF Doc. No. 182).  In the more than nine years since this case was filed, and despite having obtained summary judgment in the amount of more than $11 million against defendants Daibes Oil, LLC and Munir J. Daibes, NEP has been unable to collect any monies because these defendants are allegedly judgment proof.  Fred Daibes is the only defendant remaining from whom NEP could collect a judgment.  Because of the repeated adjournments of the trial date, NEP has been unable to put its case to a jury for adjudication.

  Each time this case has been on the cusp of trial, Mr. Daibes has asked (or at least suggested) that trial should be put off in deference to his pending criminal proceeding before Judge Wigenton.  Although the Court has never expressly ruled on any of these requests, the repeated adjournments of trial suggest Mr. Daibes's references to his criminal proceeding are having their desired impact, as illustrated below:

- Two months after the Final Pretrial Order was entered, on July 23, 2019, Mr. Daibes moved in limine to stay this matter until his criminal proceeding was concluded, citing Fifth Amendment concerns and arguing that this case involves the same issues as the

**DAY PITNEY** LLP

Honorable Claire C. Cecchi, U.S.D.J.
July 6, 2023
Page 2

criminal proceeding (it does not).  (ECF Doc. No. 185).  NEP strongly opposed that motion.  To date, this Court has never expressly granted or denied this motion.

- On June 17, 2022, the Court set a trial date of November 14, 2022.  (ECF Doc. No. 202).  Three months later, on September 23, 2022, Mr. Daibes requested an adjournment of that date because, according to Mr. Daibes, his sentencing (following a guilty plea) had been "unexpectedly, and over the objection of all parties, including Mr. Daibes" adjourned from September 6, 2022 to December 12, 2022.  (ECF Doc. No. 204).  Again, NEP opposed that request.  (ECF Doc. No. 206).  Over NEP's objection, the Court adjourned the trial to April 11, 2023.  (ECF Doc. No. 208).

- On March 7, 2023, at the Court's suggestion, the parties jointly requested that the trial date be postponed for a brief period because Mr. Daibes' criminal sentencing had once again been adjourned, this time to March 28, 2023.  The basis for NEP agreeing to same was Mr. Daibes' counsel's representation to the Court and NEP's counsel that Mr. Daibes could not discuss settlement (because of an alleged need for financing of same), and the April 11, 2023 pending trial date would not provide adequate time to reach a resolution post-sentencing.  (ECF Doc. No. 213).  As was made clear, NEP's rationale for agreeing to that joint request was its belief that Mr. Daibes's sentencing would facilitate a settlement.  On March 29, 2023, this Court adjourned the trial date from April 11, 2023 to June 26, 2023, with the understanding that this was a preemptory trial date.  (ECF Doc. No. 218).

- Before the Court set the June 26, 2023 trial date, but after the parties had submitted the joint letter, Judge Wigenton again adjourned Mr. Daibes's sentencing in the criminal proceeding, this time to July 27, 2023.  On June 2, 2023, Mr. Daibes wrote to this Court, suggesting that a renewal of the stay motion might be necessary in view of the adjournment of the sentencing.  (ECF Doc. No. 219).  According to counsel's request, once again, the adjournment of sentencing was "unexpected" and "truly unanticipated." (*Id.*).

- On June 14, 2023, over NEP's strenuous objection (*see* ECF Doc. No. 220) (and without consent of the parties), this Court again adjourned the June 26, 2023 trial date.  In doing so, the Court's Text Order acknowledged the letters submitted by Mr. Daibes relaying the status of his criminal proceeding and his continued desire to stave off the trial of this matter.

With no trial date currently on the calendar, Mr. Daibes has received, in effect, a *four year* stay of this proceeding to allow his criminal case to be resolved since he made his first request for a stay in July of 2019.  NEP has previously briefed (and reiterated) why Mr. Daibes' Fifth Amendment concerns are meritless, and it does not reiterate those arguments here.  But, even legitimate Fifth Amendment concerns must ultimately give way when their impact is to

115281759

**DAY PITNEY LLP**

Honorable Claire C. Cecchi, U.S.D.J.
July 6, 2023
Page 3

severely prejudice a civil plaintiff. *Walsh Secs., Inc. v. Cristo Mgmt., Ltd.*, 7 F. Supp. 2d 523, 527 (D.N.J. 1998) (noting importance of prejudice to the plaintiff in considering whether to grant or deny a stay). That threshold has been crossed here. A stay of a civil case is an extraordinary remedy, and there is simply no factual or legal basis for same, *de facto* or explicit, in this 9 year old matter. *See id.* at 526.

Here, the prejudice to NEP continues to mount with each passing day. NEP has previously noted the issue that several of its key witnesses are now in their late 70s/early 80s and one of those witnesses has recently battled back from cancer. Thus, there are very real witness availability concerns on NEP's end that will only become more acute over time.

Also, we recently learned that the witness issues in this case are not unique to NEP. In advance of the most recent trial date, NEP subpoenaed Judy Knight (an employee of Mr. Daibes) who notarized the guaranty on which Mr. Daibes claims his signature was forged. For obvious reasons, Ms. Knight is an extraordinarily important witness in this case. Yet, on June 20, 2023, Ms. Knight wrote to this office saying:

> I understand that I might be scheduled for June 26th however I don't drive to Newark. I am 75 years old and that is not good for me. Further, *I can't remember a thing about what occurred regarding this Subpoena. This allegedly occurred years ago.*

(*See* Exhibit A, attached hereto (emphasis added)). NEP is hopeful that Ms. Knight's travel arrangements can be worked out and her memory refreshed, but her email underscores the very real prejudice to NEP as this case marches toward its one decade anniversary. (*Id.*). Indeed, NEP may be deprived of any meaningful cross-examination of Ms. Knight (besides merely reading her deposition into the record) if her recollection of events is truly gone.

Another recent development favoring the prompt scheduling of the trial in this matter is that Mr. Daibes's sentencing appears unlikely to be forthcoming at any time in the immediate future. In May of this year, the New Jersey State Commission of Investigation ("SCI") released a report on Mr. Daibes, indicating that he provided personal and economic perks to local officials in Edgewater, seemingly in the hopes of furthering his business and development interests there. (*See* Exhibit B, attached hereto, at 1-2). The report further implicated Mr. Daibes in payments made to "organized crime associates or their relatives." (*Id.* at 2). While we do not recount all the sordid details of that report here, it suffices to state that the report indicates that the SCI made "necessary referrals of findings of potential criminality to [the] appropriate prosecuting authority." (*Id.* at 2). Put bluntly, Mr. Daibes's criminal woes appear far from over.

The continuing harm to NEP from further delays in trial scheduling, particularly due to witness availability, coupled with the fact that Mr. Daibes's criminal concerns are unlikely to be resolved at any point in the near future, underscore the necessity of setting a new date for trial as

115281759

**DAY PITNEY** LLP

Honorable Claire C. Cecchi, U.S.D.J.
July 6, 2023
Page 4

soon as possible.  Indeed, it would be a perverse result if Mr. Daibes were to benefit from the array of criminal allegations against him by using them as a basis to indefinitely forestall adjudication and payment in what should be a straightforward civil collection matter that is completely removed from any of those criminal allegations.

      In view of the recent developments recounted above; *i.e.*, Ms. Knight's availability issues and her supposedly vanished recollection and the SCI report, NEP reiterates its request for an in-person status conference to discuss a new date for trial.

      In the event the Court's calendar is unable to accommodate the trial of this case in the imminent future, we encourage the Court to consider transferring this matter to another judge who may be able to preside over the trial of this matter sooner.

      We thank the Court for its attention to this matter.

Respectfully yours,

/s/ *Mark Salah Morgan*

Mark Salah Morgan

MSM

Encl.

cc:    Lawrence Lustberg, Esq. (via ECF)
       Kevin C. Corriston, Esq. (via ECF)
       Munir Daibes, individually and on behalf of Daibes Oil (via regular mail)

115281759

# Exhibit A

**Fialkoff, Michael L.**

| | |
|---|---|
| **From:** | Judy Packer <jpacker@daibes.com> |
| **Sent:** | Tuesday, June 20, 2023 8:33 AM |
| **To:** | Fialkoff, Michael L. |
| **Subject:** | New England Petroleum v Daibes OIl, et al |
| **Importance:** | High |

**CAUTION - EXTERNAL EMAIL**
**DO NOT click links or open attachments unless you recognize the sender and know the content is safe.**

Hello Michael,

I understand that I might be scheduled for June 26th however I don't drive to Newark.  I am 75 years old and that is not good for me. Further, I can't remember a thing about what occurred regarding this Subpoena.

This allegedly occurred years ago.

Judy D. Knight

# Exhibit B



*State of New Jersey*
*Commission of Investigation*

# <u>PUBLIC MATTERS, PRIVATE INTERESTS</u>

## An Inquiry into Local Government Ethics and Integrity Issues in the Borough of Edgewater

*May 2023*

*State of New Jersey*
*Commission of Investigation*



# PUBLIC MATTERS, PRIVATE INTERESTS

## An Inquiry into Local Government Ethics and Integrity Issues in the Borough of Edgewater

*SCI*
**50 West State St.**
**P.O. Box 045**
**Trenton, N.J.**
**08625-0045**
**609.292.6767**

**www.state.nj.us/sci**



# State of New Jersey

COMMISSION OF INVESTIGATION
50 WEST STATE STREET
PO Box - 045
TRENTON, NEW JERSEY 08625-0045
Telephone (609) 292-6767
Fax (609) 633-7366

Tiffany Williams Brewer
*Chair*

Robert J. Burzichelli
Kevin R. Reina
John P. Lacey
*Commissioners*

Chadd W. Lackey
*Executive Director*

May 2023

Governor Phil Murphy
The President and Members of the Senate
The Speaker and Members of the General Assembly

The State Commission of Investigation, pursuant to N.J.S.A. 52:9M-1 to -20, herewith submits its final report of findings and recommendations stemming from an investigation into questionable local government ethics and integrity issues in the Borough of Edgewater. [1]

Respectfully,

Tiffany Williams Brewer
Chair

Robert J. Burzichelli
Commissioner

Kevin R. Reina
Commissioner

---

[1] Commissioner John P. Lacey, who joined the Commission in January 2022, was formally recused from this matter and did not participate in any aspect of the inquiry.

# TABLE OF CONTENTS

*Introduction* .........................................................................1

*Summary of Key Findings* ...............................................4

Local Officials With Financial Ties to the Developer ......................**8**

Municipal Actions or Inactions Benefitting the Developer............... **12**

Illicit Business Practices/Questionable Financial Transactions......... **25**

*Referrals and Recommendations* ...................................**30**

*Appendix*......................................................................**A-1**

# *Introduction*

For the past 50 years, the New Jersey State Commission of Investigation (SCI or the Commission) has repeatedly exposed waste, abuse and corruption in local government, revealing how questionable employee payments, outrageous perks and other inappropriate municipal actions needlessly burdened taxpayers or failed to protect their best interests.

Over the years, the Commission has returned to areas where a pattern of dubious practices and poor governance continues to fail residents. The SCI last wrote about corruption in Edgewater Borough in 1992 after the town's former mayor was convicted on federal charges for taking payoffs from organized crime associates to speed approvals for a luxury condominium project.[2] In its latest investigation, the SCI found problems persist in the Bergen County municipality, particularly concerning the local government's oversight of real estate and development matters.

The Commission's investigation found Borough officials repeatedly abdicated their sworn responsibilities to safeguard public tax monies and the interests of *all* residents, to protect their own personal and financial concerns and those of private developer Fred Daibes. The politically savvy businessman, who transformed much of the Hudson River waterfront town over the last two decades into an upscale enclave for Manhattan commuters, grew up in Edgewater and still lives there. SCI investigators found some local officials received personal perks and economic

---

[2] In 1989, former Mayor Thomas Tansey pled guilty to taking $20,000 in bribes from Genovese organized crime family associates to secure municipal approvals for the Shelter Bay complex. See *Local Government Corruption (1992)* https://www.state.nj.us/sci/pdf/lgco.pdf

benefits from the developer, which raised questions about the motives behind official actions favorable to Daibes.[3]

The SCI found Daibes' power and influence within Edgewater were so strong he even held sway in local political decisions and other municipal concerns. Numerous examples showed local officials took questionable municipal actions to benefit Daibes, one of the town's largest landholders and a major employer as the owner of Daibes Enterprises. The inquiry also revealed troubling findings related to Daibes' business operations, associates and efforts to circumvent particular government regulations. Some of the government actions taken in Edgewater to benefit Daibes would come at a high cost for local taxpayers, public coffers and the community's reputation. Meanwhile, municipal officers who took official actions unsupportive of the developer faced political and professional retribution.

The Commission carried out this investigation in accordance with its statutory mandate to identify and uncover corruption and government laxity, reveal tax dollar waste and protect the integrity of government operations.[4] During the course of the inquiry, also consistent with our mandate,  the SCI uncovered evidence of the reasonable possibility of criminal wrongdoing and information indicating unspecified payments to organized crime associates or their relatives.[5] An extensive and multi-faceted investigation, the report was delayed, in part, by the COVID-19 pandemic and necessary referrals of findings of potential criminality to appropriate prosecuting authorities. To conduct the inquiry, the Commission issued more than 100

---

[3] The former chairman of the North Jersey-based Mariner's Bancorp, Daibes in April 2022 pled guilty to making false entries in books and records of an FDIC-insured bank.
[4] N.J.S.A. 52:9M-1 to -20
[5] N.J.S.A. 52:9M-11

subpoenas, analyzed scores of financial records, conducted interviews and obtained sworn testimony from more than 50 local and state officials, business owners, housing advocates and individuals and employees of entities engaged in suspect or illicit conduct.

This report is a cautionary tale concerning the inherent dangers of enabling an influential, politically-connected and unelected private citizen to hold outsized power in government concerns. The failure of elected and appointed officials to honor their oath of office and put the needs of their constituents above their self-interests when conducting the people's business came at a steep price in Edgewater, negatively impacting local finances and public trust.

The Commission recognizes that most of those serving in local government in New Jersey are committed to protecting the public interest. But the findings made in this inquiry underscore the need for stricter statewide regulation and guidance for elected and appointed local government office holders on matters concerning ethics, including instituting mandatory ethics training and more comprehensive financial disclosures. The first step should be strengthening the Local Government Ethics Law, the primary legal mechanism guiding standards of ethical conduct for municipal and county employees, which has not been substantially updated since its enactment 30 years ago. Additional recommendations include the adoption of safeguards to keep cleanups of environmentally contaminated sites less vulnerable to contractor abuse and manipulation and a study to determine if state oversight of affordable housing mandates should be re-established in New Jersey.

A detailed presentation of the Commission's core proposals for reform, along with other common-sense recommendations, can be found at the end of this report.

# *Summary of Key Findings*

The Commission's findings fall broadly into three major areas:

- **Local Officials with Financial Ties to the Developer**
- **Municipal Actions or Inactions Benefiting the Developer**
- **Illicit Business Practices/Questionable Financial Transactions**

## Local Officials with Financial Ties to the Developer

- The Commission found some local elected officials received economic benefits – often not publicly disclosed – from Daibes, raising questions about the integrity, ethics and motives behind government actions to aid the developer or his commercial entities.

- More than half of Councilman Jose Luis Vidal's business revenue – totaling more than $2.6 million between 2015 and 2018 – was provided by Fred Daibes and his business partner for flooring projects. Vidal voted in favor of numerous measures beneficial to the developer and his business interests, including giving Daibes' firm Waterside Construction the contract for a major municipal park renovation.

- Edgewater Mayor Michael McPartland received below market, payment-deferred and interest-free rent at a luxury apartment building owned by Daibes.[6] The arrangement began months after McPartland's appointment as mayor in January 2015.

---

[6] The rent was repaid without interest or penalty.

- Former Mayor James Delaney's wife was a long-standing employee at a Daibes-owned restaurant. However, her employment ended abruptly after her husband spearheaded the Borough's effort to sue Daibes for allegedly ruining the renovation of a municipal park.

## Municipal Actions or Inactions Benefiting the Developer

- The Commission found Daibes' influence extended to weighing in on general municipal issues and local political decisions. More recently, his longtime business attorney was appointed as the Edgewater Borough Attorney.

- The Borough's construction official ignored information that tenants appeared to be already living in a Daibes-built high-rise before receiving a certificate of occupancy and missed an incomplete fire exit above a steep cliff. The subordinate inspector who discovered and reported the unfinished exit later told the Commission he faced retaliation by Borough officials.

- The Borough failed to effectively evaluate Waterside's "excessively low" bid, oversee its work and manage the fallout from the firm's alleged toxic dumping that occurred during the renovation of a public park. The park project ended up costing taxpayers $28 million – nearly three times the initial estimate – and increased local property taxes. Legal fees for the still unresolved matter have cost Borough residents $1.1 million so far.

- Former Mayor Delaney testified he was effectively pushed out of office after he urged the Borough Council to sue Daibes over the botched field project. Delaney and his wife testified that the mayor's public actions opposing the developer

5

    caused him to lose political support, made the family pariahs in the community, ended his wife's employment and resulted in them moving out of the town.

- The Borough Council authorized the use of eminent domain to seize 615 River Road, one of the last undeveloped sites on the town's waterfront and a potential tax ratable worth $12.3 million annually, to construct a public works facility and for other municipal uses. The decision occurred not long after Daibes – who unsuccessfully sought to buy the tract – told a zoning board member he opposed a rival developer's plan to build high-density housing at the site.

- The Commission found Edgewater officials enabled Daibes to secure a kind of "double dip" benefit by authorizing him to receive direct payments from other developers to build affordable housing units in local projects in which he already received a government tax break to construct. Daibes never informed government authorities of this additional funding despite the legal requirement to do so to maintain his $2 million tax subsidy under the Low Income Housing Tax Credit Program.

## Illicit Business Practices/Questionable Financial Transactions

    The Commission uncovered other financial activity concerning Daibes and his corporate entities, including illicit business practices, the questionable collection of unemployment insurance benefits and nonspecific payments to associates of organized crime. As required under the Commission's statutory authority, all evidence of a reasonable possibility of criminal wrongdoing was referred to appropriate law enforcement authorities.

### Cash Payroll

- More than $3.9 million in payroll for Waterside Construction was given to employees in cash for at least 18 months, enabling the Daibes-owned business to avoid its legal responsibility to pay state and federal employment taxes. The SCI's findings were referred to the Office of the United States Attorney for the District of New Jersey and the Division of Criminal Justice in the New Jersey Office of the Attorney General.

### Potential Unemployment Insurance Fraud

- Three Daibes employees appeared to have inappropriately collected tens of thousands of dollars in unemployment insurance from the State of New Jersey while simultaneously collecting a salary or payments from his firms. The findings were referred to the New Jersey State Department of Labor and Workforce Development and the Division of Criminal Justice.

### Unspecified Payments to Associates or Relatives of Organized Crime Members

- The Commission found Daibes wrote more than a dozen personal checks for unspecified payments totaling more than $100,000 to the son and daughter-in-law of a high-ranking Genovese organized crime family member who was a key operative in an illegal gambling ring in northern New Jersey in the 2000s. When asked by the SCI about the nature of the payments, both Daibes and a beneficiary of the payments invoked their Fifth Amendment right against self-incrimination.

7

- Robert Fischetti, a former Councilwoman's husband and a longtime Genovese crime family associate with a history of gambling convictions, lived rent-free in a Daibes-built and owned apartment building from 2005 until 2018. Fischetti's costless living arrangement ended shortly after the SCI issued a subpoena seeking financial records related to Daibes.[7]

# *Factual Findings*

## LOCAL OFFICIALS WITH FINANCIAL TIES TO THE DEVELOPER

### *Lucrative Contract Work for a Councilman*

When longtime Edgewater Councilman Jose Luis Vidal launched a new business venture connected to his flooring firm around 2013, he needed to borrow money because he had no credit with suppliers to get materials. Instead of going to a local bank, his friend, the late Edgewater Mayor Bryan Christiansen, loaned him the cash.[8]

Vidal, a councilman since 2008, told the Commission he paid back the tens of thousands of dollars in interest-free loans the former mayor provided to him, added employees and began working on commercial and residential projects primarily in Bergen and Hudson counties. Soon, Vidal would have more than half of his business revenue – more than $2.6 million between 2015 and 2018 – provided by entities owned by Daibes and the developer's longtime business partner

---

[7] Although Daibes sold the building in February 2014, financial records indicated checks from his firm Waterside Construction paid Fischetti's rent until March 2018.
[8] A review of financial documents indicated at the time of the loans, Christiansen regularly received payments from Daibes' entities from his involvement in several lucrative business ventures with the developer.

James Demetrakis.[9] The Commission's review of financial records found Vidal's business, Celtic Logs & Lumber, received $1.25 million from the Daibes-owned firm Waterside Construction alone. Financial documents reviewed by SCI investigators revealed Celtic Logs & Lumber received the funds for flooring installation projects from businesses owned by either Daibes or Demetrakis. Those projects included Waterford Towers, a senior housing complex built by Daibes in Edgewater, and the Duchess, a luxury apartment building project for which Celtic and Waterside Construction had a contractual agreement.

Edgewater residents likely never knew of the Councilman's financial ties to Daibes because the state law that guides the ethical conduct of municipal and county officials – The Local Government Ethics Law – does not require public disclosure of income derived from clients, even when the circumstances could reasonably present a potential conflict of interest. Local public officers must annually file financial disclosure forms reporting the name and address of each source of income, earned or unearned, received in the prior calendar year above $2,000. However, the ethics law does not mandate reporting individual client fees, customer receipts or commissions on transactions received through a business organization.[10] Therefore, Vidal's only income sources for that period were the Borough of Edgewater and Celtic Logs & Lumber.

Lacking any legal requirement to disclose finances related to client payments means this information can be kept private, even in cases where such fiscal arrangements could present a potential conflict of interest for a public official. Local officials are effectively on their own in

---

[9] Financial records reviewed by the Commission found payments were either from entities owned by Daibes, the developer's longtime business partner Demetrakis or other entities based at his former headquarters at 1000 Portside Drive.

[10] N.J.S.A. 40A:9-22.6 (a) (1) Local officials must also report an immediate family member's income source, earned or unearned, if it exceeds $2,000.

deciding whether to go beyond the law and publically disclose the information to avoid any appearance of impropriety. By comparison, employees who work for the State government are subject to the New Jersey Conflicts of Interest Law, which provides detailed advice on managing ethical matters.[11] Unlike local government officials, state employees and officials also undergo mandatory ethics training.

Edgewater Mayor Michael McPartland told the Commission fellow municipal officials with concerns about potential conflicts of interest should conduct their own due diligence by reporting any matters of concern to the Borough attorney. In Vidal's case, he testified he thought his business relationship with Daibes was disclosed to the Borough attorney at the time but could not be sure. Vidal did not recall ever receiving a written legal opinion from the municipal counsel to determine if it was appropriate for him to vote on matters related to Daibes. He told the Commission he recalled abstaining from voting on some issues related to the developer. Even though he believed his colleagues on the Council knew he received income from the developer's firm, Vidal testified he never made any formal announcements or issued any statements disclosing that information to them or the public.

Despite Vidal's initial testimony that he abstained from voting on local government matters concerning Daibes and his business interests, his voting record proved otherwise. A review of Borough Council resolutions since 2012 showed Vidal voted affirmatively on multiple measures that directly benefited Daibes, including awarding Waterside Construction a Borough contract to renovate Veterans Field in June 2012. Vidal also voted in favor of liquor license renewals for Le Jardin, the restaurant Daibes once owned at 1257 River Road, and for zoning

---

[11] N.J.S.A. 52:13D-12 to -28

changes allowing high-density housing at Daibes-owned properties, thus enabling the developer to increase the number of units in specific projects significantly and potentially make them more lucrative.

### The Mayor's Rent Arrangement

SCI investigators found Mayor McPartland had an undisclosed arrangement that enabled him to live at one point for free and, later, at a significantly below market rate in a luxury apartment building owned by the developer. The arrangement occurred within months of his January 2015 appointment as mayor. From July 2015 until January 2016, McPartland lived in the model apartment, a one-bedroom studio at The Alexander, a luxury hotel-style housing complex, without paying monthly rent. The terms were set under a verbal agreement with Daibes' sister, the property manager.

An SCI review of financial records indicated McPartland eventually paid the deferred rent in February 2016 by issuing a $21,600 check, absent interest, from his personal checking account. McPartland did not write out the check payable to The Alexander or a management firm, often responsible for handling rent payments for housing complexes. Instead, he made out the check to Fred Daibes personally. In sworn testimony before the Commission, McPartland said he made the payment directly to Daibes "to make sure that everybody knew that I paid." The mayor testified he paid off the owed rent after signing a contract for a larger apartment in the complex.

Financial records reviewed by SCI investigators indicated that the mayor made subsequent monthly rent payments to The Alexander. However, the Commission found the rent paid by McPartland was significantly below the market rate at the upscale residence. A financial review of checks paid by McPartland to The Alexander revealed the mayor paid $1,940 less than

the stated monthly market rate for the apartment in 2019, according to information provided to the Commission by a representative for The Alexander.[12] A review of McPartland's financial disclosure forms found he reported neither the initial $21,600 benefit nor the continuing rent discount.

*        *        *

The Commission also found former Mayor James Delaney had a financial link to Daibes through his wife's employment at the now-shuttered Le Jardin restaurant, owned by the developer. However, the economic tie was quickly severed after a public falling out between the two men. More details about what occurred when Delaney took a public stance against the developer, how his wife's longtime service at Daibes' business ended abruptly, and the political and personal fallout arising from those circumstances are detailed later in this report.

## MUNICIPAL ACTIONS OR INACTIONS BENEFITING THE DEVELOPER

The Commission found Daibes had access to elected and appointed officials in the Borough and held influence in municipal concerns despite the fact he was an unelected private businessman. Former Mayor Delaney told the SCI he spoke regularly with Daibes to discuss various matters, not just those related to real estate and development.

In certain instances, SCI investigators found there was questionable Borough oversight of Daibes and his employees on development projects in Edgewater.  When a Daibes firm was

---

[12] McPartland and Daibes notified the Commission that the below market rate was due to the apartment's position above trash dumpsters.

completing the construction of the St. Moritz high-rise apartments in the early 2000s, the Borough Construction Official ignored information from a subcode official that tenants appeared to be already unlawfully living in the units before the building's receipt of a certificate of occupancy. During a building inspection, the Construction Official also missed an incomplete fire exit "onto non level ground above a steep cliff with no access to a public way." This mistake put tenants in even greater jeopardy in an emergency. The exit to nowhere – discovered during a follow-up inspection two years after the building's opening – left residents seeking safety in the event of a fire with the option of either scaling a cliffside or jumping down 15 feet to flee the complex. Charles Batch, the fire subcode official who flagged and reported the error, had battled with Daibes on safety-related issues throughout the project. He told the Commission that when he retired a few months later, the Borough refused to pay him earned sick time pay, alleging he abused overtime. Batch testified that it was retaliation for reporting the violations. Batch later settled with Edgewater after filing a whistleblower suit against the Borough, spending $45,000 in legal fees to get his payout.

The following examples further illustrate some of the favored treatment Borough officials gave Daibes and the negative impact those actions had on the community.

## Veterans Field

Veterans Field, Edgewater's premier waterfront park, had been closed for months in 2011 following the discovery of environmental contamination, leaving local kids without access to athletic fields and other recreation. In June 2012, Daibes' Waterside Construction won a $7.1 million Borough contract to clean up and renovate the park, the place where he once played

baseball and football as a child. At the time, Daibes told a local newspaper, "I grew up in Edgewater. This is where I want my legacy to be."

Daibes' lasting legacy at Veterans Field would be marred by allegations of mismanagement, negligence and fraud after his firm's employees were observed dumping unknown material and mixing it with clean fill at the site. The costs to clean up the contamination, finish the job and pursue legal remedies against Daibes rose to more than $28 million, nearly triple the initial estimate for the project.[13] Local property taxes increased due to costs associated with the field fiasco.

In May 2012, Edgewater sought public bids for an extensive renovation and remediation of the waterfront park, estimated to cost $9.7 million.[14] The remediation component of the project required the removal of five soil "hot spots," areas that environmental testing indicated had elevated levels of contamination. The fill material used to grade the field at an earlier point was found to be contaminated, prompting its closure in September 2011.[15] Environmental regulators also believed the site was once covered by water from the Hudson River. The contaminated areas required removal or capping with clean material under state Department of Environmental Protection (DEP) testing guidelines. Along with the site remediation work, renovations for the 27.6-acre park included upgrading the athletic fields and other recreational amenities.

---

[13] Additional expenses in the $28 million total included expanding the scope of the park project after Waterside was terminated.

[14] State Green Acres and Bergen County Open Space grants funded approximately $1.7 million of the project.

[15] Environmental tests found polycyclic aromatic hydrocarbons, or PAHs, were elevated in the park's historic fill well above the government standard levels for residential areas. Polychlorinated biphenyls, or PCBs, were also slightly above acceptable levels.

Of the five public bids submitted, Waterside Construction's proposal was approximately $2.5 million below the project estimate and substantially less than the next lowest bidder. Among the differences in the bids were the amounts budgeted for importing certified clean fill to replace contaminated soil at the site. Waterside Construction estimated its costs to import clean fill at $833,000 – nearly half a million dollars less than its closest competitor. Waterside Construction's fees for excavation work were also only $25,000, approximately a tenth of the cost in the proposal from the next lowest firm. The Director of Construction for Neglia Engineering Associates, the Borough's firm, testified he initially balked at the Waterside Construction bid because it was "excessively low." Despite those concerns, after Borough officials contacted Waterside Construction to verify the bid documents were accurate, they agreed the firm was the lowest responsible bidder, and the Council voted 5-0 to award the $7.1 million contract to Daibes' company.

Once the work began, disputes began almost immediately at the worksite over the material Daibes wanted to use for the fill. Within the first month of the project, Daibes was already asking about bringing in unsuitable material and the possibility of using it with clean fill, according to testimony from Ronald Dooney, owner of TERMS Environmental Services, hired by Borough officials to supervise the remediation. He described a meeting in Daibes' office discussing the matter.

> *…That was what the meeting was because he was trying to bring in fill that – the initial pile he wanted to bring in was from his construction yard and it was full of debris and this was supposed to be clean fill coming into the site to cap the dirty stuff and there were things sticking out of it, drums and what not [sic].*

In the early stages of the work, Daibes had access to certified clean fill material from a nearby construction site that another contractor allowed him to take free of charge, according to testimony from multiple witnesses involved in the project. But once that source dried up, the developer was left scrambling to find appropriate fill material. It quickly became apparent Daibes had no reliable source for clean fill yet was unwilling to pay to obtain it from a quarry. Dooney explained:

> And then the question[s] started coming up about we got to find material and, you know, how are we going to do this? Why can't we bring in stuff that's contaminated as long as it goes deeper, so it was, you know, from that point, I realized this was going to be an ongoing battle to keep them – just go to the quarry. We said it numerous times, go to the quarry and get quarry material. And his answer was, numerous times, that's never going to happen. That's going to cost way too much.

In New Jersey, private individuals like Dooney are certified by the state as licensed site remediation professionals (LSRPs) to oversee environmental remediation projects. However, the Commission found Dooney's firm was assigned an unusual task on the Veterans Field project. The Borough paid TERMS to test material brought in by the Daibes firm and ensure it was clean under DEP standards – a responsibility typically assigned to the contractor importing the fill. Soon, a regular pattern emerged. Daibes would identify fill material and expedited tests – at an elevated cost – were ordered to determine its quality, and then TERMS would often reject it based on unsuitability. Tensions grew at the job site. One fall day in 2012, things reached a boiling point between Daibes and a TERMS supervisor who refused to allow unclean fill on the job site. The same supervisor had also repeatedly warned the developer that dust monitor readings showed unhealthy air quality levels at the field after Waterside Construction failed to provide a water

truck to hose down the site.[16] After the two men argued at the job site, Dooney testified he went to the field to speak directly with Daibes about the situation.

> *And that's when I went out and I met Fred Daibes at the site and he started screaming at me, you know, nobody tells me what to do in my town. And I said, you can't bring this stuff in. Well, I want that guy off of here.*

Dooney told the Commission a representative with the Borough's engineering firm advised him the town would terminate TERMS' contract if he insisted on keeping the supervisor who clashed with Daibes on the job. Days later, he reassigned the supervisor "to keep the peace."

The project was already well underway when Superstorm Sandy hit on October 29, 2012, destroying much of the earlier work and inflicting more than $200,000 in damages. Waterside Construction needed to redo prior work, raise the grade at the field and perform other measures to improve drainage and prevent erosion. The revisions increased project costs by more than $500,000 and required another almost 30,000 cubic yards – more than 1,500 truckloads – of clean fill.

Under its agreement with the Borough, TERMS needed to test and approve any fill material before it was used at the field. Field notes from Jason Menzella, chief inspector for Neglia Engineering, indicated that on August 8, 2013, Waterside Construction brought in loads of fill material when TERMS was not present at the field. The log entry read, "Waterside on site @ Vets Field in Edgewater. Waterside is recieving [sic], spreading, and compacting materials brought in by tandem. Terms is not on site." It would not be an isolated event.

---

[16] After the TERMS employee complained about the dust problem, Edgewater officials sent a Borough water truck to the site.

### The Disputed Dumping Incident

No work was scheduled to take place on September 7, 2013 – a Saturday – so Menzella told the Commission he was surprised to see a fleet of trucks and machines going back and forth at Veterans Field as he drove through town on his way home from a baseball game.

Pulling into the job site, he witnessed unsupervised laborers dumping materials, specifically recycled concrete aggregate – untested crushed concrete – and then covering it with clean stone. When he asked the laborers what was going on, Menzella testified they said, "I don't know, I just work here."

Subsequent testing revealed the materials trucked into the site contained extremely elevated levels of PCBs, a probable cancer-causing substance. Still, it would take nearly a month before TERMS shut down the job site while Daibes' employees continued to work and deliver more fill to the site. Initially, the Daibes firm denied knowingly dumping toxic material at the site. Days later, in a local news story, a Daibes representative claimed the crushed stone brought to the field was from a demolished structure at the former Alcoa site, an aluminum plant on River Road then owned by the developer that had undergone an environmental cleanup in the 1990s. The spokesman claimed both the DEP and TERMS had approved reusing materials from the Alcoa site, a claim the environmental firm has denied.

### The Price of Opposition

Former Mayor Delaney testified he and his family faced political and personal reprisals after he led the municipality's effort to sue Daibes over the Veterans Field project.

Initially, Edgewater Borough officials were willing to allow Waterside Construction to clean up its mess as permitted under the terms of its contract. Delaney publicly defended the

developer, saying the project was Daibes' "pride and joy" and that municipal personnel did not intend to fire him. However, behind the scenes, Delaney told his colleagues he wanted to remove Waterside Construction, a move that started a rift between the mayor and other governing body members even though the Council later approved suing Daibes for breach of contract in August 2014.

The mayor testified he soon lost political allies and support in the town, making him a lame-duck mayor. At one point, two council members visited his home to inform him he effectively had no say in Borough matters. Not long after that, the Council declined to reappoint two of Delaney's preferred professional service contractors – the municipality's longtime engineering firm, Neglia Engineering, whose employee first discovered the dumping at the field, and the Borough Attorney. Other Council members asked him when he planned to resign. Delaney declined to comment on Daibes' actions specifically but told the Commission, "I would say he had control over the town for a long time."

His wife, Bridget, who worked at the Daibes-owned Le Jardin restaurant for 14 years, testified she felt blindsided when informed by her manager that she could no longer work there due to the discord between her husband and Daibes.[17] She told Commission counsel under oath that her family, including the couple's children, became outcasts in the community.

> **Q**: *Did you feel pushed out of town?*
>
> **A**: *I absolutely felt, I felt abandoned. I felt beyond pushed. I mean, I – the people that I like considered my closest friends, okay, who I considered my closest friends, nobody talks to me.*

---

[17] Gus Lita, the manager and part-owner of Le Jardin who has had financial ties with Daibes for more than two decades, told the Commission when Mrs. Delaney gave her two weeks' notice, she cited personal problems as the reason for ending her employment at the restaurant.

The fallout from Veterans Field prompted Delaney to end his political career and lifelong residency in Edgewater. In December 2014, he resigned as mayor and shortly thereafter moved his family out of town.

Almost a decade since the dumping occurred at the public park, the Veterans Field saga is still not over. No resolution appears imminent in the Borough's lawsuit against Daibes and environmental regulators for negligence. While the municipality seeks to recover costs from the field debacle, so far the effort has resulted in additional financial burden on local taxpayers with more than $1.1 million already spent on legal fees related to the matter.[18]

## 615 River Road

The former oil tank farm known as the Hess property, located at 615 River Road, was among the last large vacant parcels on Edgewater's waterfront, a former industrial area now dotted with upscale condominiums and shops on a strip of land called the Hudson River Gold Coast. Its redevelopment promised to bring millions of dollars in tax revenues to the municipality.

A private developer purchased the property in 2014 with plans for a sprawling multi-use development; however, the project remained stalled for years as local officials and its owners engaged in a costly legal dispute over its future.

Fred Daibes had once tried to purchase the 18.7-acre site – even at one point allegedly asking the Borough to reach out to Hess at his behest – but later lost out to 615 River Road Partners.[19] Still, Daibes – the owner of the adjacent properties – would factor prominently in the

---

[18] The Commission's review of Borough legal bills found the municipality paid $1.1 million to an outside legal firm to handle the Veterans Field litigation between 2016 and 2021.

[19] A copy of a letter of intent to purchase the property is appended to this report.

prolonged battle over the tract. Borough officials claimed the project proposed by 615 River Road Partners was too large and would overburden the local roads and schools, despite projections it would generate $12.3 million in tax revenue and add affordable housing units. Edgewater said the zoning board did not review the project due to incomplete paperwork filed by the private developers; 615 River Road Partners insisted the board refused to meet on the matter.

A local zoning board member – and longtime Daibes employee – sought his input on the rival developer's proposal. Not long after Daibes told his former employee he opposed the project, Borough officials finalized a plan to use their government powers to seize the privately owned property through eminent domain and use it to build a public works facility.[20]  The idea to use the prime real estate for a public works garage surprised former Mayor James Delaney, who told the Commission there had been talks about constructing a public works building behind the Exxon gas station on Old River Road but not at the Hess property. Delaney testified: "Never did we talk about putting a DPW on the Hudson River, you know?"

In December 2017, 615 River Road Partners filed a lawsuit alleging corruption and collusion between Borough officials and Daibes to block the multi-use development on the former industrial site claiming it would compete with the developer's properties. The lawsuit cited a litany of questionable dealings and conflicts of interests concerning Daibes and local elected officials, claiming that the developer essentially controlled high-density housing in the municipality and that those serving on the local governing board were beholden to him.

Edgewater Borough and 615 River Road Partners settled the dispute over the property's redevelopment in December 2019. Under the agreement, the developer consented to transfer

---

[20] The local government appropriated $25 million to purchase the property from the private owners in August 2017.

the deed for the western parcel of the property to the municipality to build a new school, create traffic relief measures and scale down the project. The project approved by Edgewater's planning board in December 2021 permitted the construction of 1,200 market-rate units including 180 affordable units built in three 25-story towers, 20,000-square feet of commercial space and a park.[21] Yet, as of April 2023, numerous matters related to the agreement remain the subject of ongoing legal actions between the parties. Although the agreement allows the town to receive land for a school, recreational space and much-needed affordable housing, it came at a steep price for Edgewater. The lawsuit cast the municipality in an unflattering light by exposing the cozy relationships between local officials and Daibes. According to an SCI review of records, it was also costly for taxpayers, incurring nearly $1.2 million in legal fees for the Borough between 2016 and 2021 alone.

## Manipulation of Low Income Housing Tax Credits

The Commission found Edgewater officials enabled Daibes to secure a kind of "double dip" benefit where other developers paid him to build affordable housing units in local projects in which he previously received a government tax break to construct.

In New Jersey, every municipality is legally required under the *Mount Laurel* legal doctrine to provide their "fair share" of their region's affordable housing needs.[22] Municipalities can require new housing projects to include below-market units to help meet that mandate. The market-rate housing usually subsidizes the costs of building those units. However, developers

---

[21] Shortly after the settlement, a nearby business and Cliffside Park Borough filed a lawsuit against Edgewater Borough, claiming the 615 River Road development will block their skyline views and accusing Edgewater officials of reaching the agreement to avoid addressing corruption allegations. The matter was resolved, according to court filings.

[22] Southern Burlington County NAACP v. Mt. Laurel, 67 N.J. 151 (1975)

who show that the market-rate homes cannot generate enough income to pay for affordable units can seek financial assistance from the government. The Low Income Housing Tax Credit (LIHTC) Program provides federal tax credits to developers to encourage the acquisition, construction and rehabilitation of affordable units.

Only a small percentage of developers receive the tax credits each year. According to the New Jersey Housing and Mortgage Financing Authority (NJHMFA) website, which administers the program, demand for the program exceeds the available funding by a margin of about three-to-one. It provides a dollar-for-dollar reduction in tax liability and acts as a catalyst to attract private investment into the affordable housing market.

In 2010, the NJHMFA approved Daibes for a $2.3 million tax break – approximately $235,000 annually over 10 years – to build 38 COAH, a new four-story apartment building in Edgewater with 38 units available for below-market rate rent.[23] A review of municipal resolutions showed the Borough Council also authorized at least $1.5 million in payments to Daibes from five developers to build affordable units at 38 COAH between 2005 and 2013, with some monies received after the building's projected completion. He did not disclose the payments, which substantially changed Daibes' costs for the project, to the NJHMFA, as lawfully required to remain eligible for the credits as previously calculated.[24] When contacted by SCI investigators, an NJHMFA official said their review of records indicated Daibes was in compliance with the terms of the program with no history of any sanctions for 38 COAH. "At no time was the NJHMFA aware that Mr. Daibes had received payments from other developers for the 38 COAH/Vreeland

---

[23] The property is alternatively referred to as 38 COAH, the Vreeland Park Residences, Vreeland Park and the Vreeland project in various documents.

[24] N.J.A.C. 5:80-33.31

project," an NJHMFA representative stated in written correspondence to the Commission. The failure to disclose changes to the project's costs meant Daibes continued to reap the full benefits of the tax credit program while also collecting monies from other developers creating the inappropriate double dip situation.

The Commission found that Daibes attempted to secure a similar arrangement in Fort Lee several years later. However, the effort largely fizzled when the NJHMFA clawed back a portion of the tax credit award after learning other developers paid for the construction of units in the project. In 2013, the Assad Y. Daibes Memorial Foundation For Special Needs Urban Renewal, Inc. qualified for $1.9 million in annual tax credits for 10 years to build a 141-unit multifamily high-rise at 69 Main Street. In August 2018, after learning of additional funding sources, project delays and other issues, the NJHMFA wrote a letter to Daibes, who had not disclosed the payments, informing him it was reducing his annual tax credit by a half-million dollars. Several months later, one of the firms that paid Daibes $2.7 million to build 20 affordable units in the building sued him to get its money back after Fort Lee officials declared the Foundation in default for failing to complete the project on time.

By failing to disclose the builders' payments, Daibes took advantage of a government program with finite resources and evaded his legal obligation to report the additional funding. The circumstances also raised questions about municipal officials' responsibility to oversee affordable housing built within their communities. Although it is legal for developers to deposit funds into a municipal trust account covering their share of affordable units owed to a town instead of constructing the units themselves, the process requires tight regulation. Moreover,

municipal affordable housing obligations are not supposed to be sold between builders, according to a fair housing advocate.

# ILLICIT BUSINESS PRACTICES/QUESTIONABLE FINANCIAL TRANSACTIONS

During the course of the inquiry, the SCI found other financial activity concerning Daibes and the operation of his corporate entities, including illicit business practices, questionable collection of unemployment benefits and nonspecific payments to organized crime associates. The Commission is statutorily required to refer information and evidence of a reasonable possibility of criminal wrongdoing to appropriate administrative agencies and law enforcement authorities. Over the years, this collaboration with law enforcement has resulted in numerous criminal prosecutions that likely would not have occurred absent the SCI's investigation.

## Cash Payroll

The Commission identified more than $3.9 million in Waterside Construction's payroll that was handed out to employees in cash for at least 18 months, enabling the Daibes-owned business to avoid its legal responsibility to pay state and federal employment taxes.

During a review of the financial records, the Commission found thousands of canceled checks from Waterside Construction made payable to a Hudson County check-cashing business between February 2017 and August 2018. The checks were issued to about 75 individuals weekly, averaging between $600 and $1,100.

SCI investigators discovered Waterside Construction was a longtime client of the check-cashing business and had established a weekly routine with the firm. Each week, a Waterside

Construction representative sent a fax to the check-cashing firm with a list of names and the face value of the check designated for each individual. After creating an envelope for each person on the list, the check casher placed the money inside. A Waterside Construction employee would later deliver the endorsed checks to the check-cashing firm and then take the envelopes containing the cash. In total, the Commission identified 111 individuals who received payments from Waterside Construction via this method.

Other factors made the cash payouts appear suspicious. Nearly all the checks were for amounts in whole dollars, such as $600, or sums ending in 50 cents, such as $750.50. Normally distributed payroll checks typically have varying amounts of cents. Further, there were no federal IRS W-2 or F1099 forms on record in either 2017 or 2018 for any Waterside Construction employees who received their salary in cash.[25]

In July 2018, Waterside Construction stopped frequenting the check-cashing business. The arrangement ended around the same time Daibes curtailed spending and other business practices leading up to his federal indictment for bank fraud in October 2018.

While the investigation uncovered the use of cash payroll during a limited 18-month period, the Commission found evidence suggesting Waterside Construction had conducted this unlawful practice for far longer and had utilized another cash-checking establishment for similar arrangements. As noted earlier, the Commission's findings in this matter were referred to the Office of the U.S. Attorney for the District of New Jersey and the Division of Criminal Justice.

---

[25] Although the employees endorsed the checks, Waterside Construction paid the fee for cashing the checks.

## Questionable Collection of Unemployment Benefits

The Commission also uncovered evidence that three Daibes employees inappropriately collected unemployment insurance from the State of New Jersey while collecting a salary or payments from the construction firm. A review of records from the state Department of Labor indicated one individual collected $17,000 in unemployment benefits from July 2016 to January 2017 while simultaneously receiving $31,000 in payments from Waterside Construction. When confronted by the SCI about the concurrent payments, the individual invoked his Fifth Amendment right against self-incrimination. The Commission's review of records found two other Daibes employees appeared to have inappropriately collected unemployment insurance benefits during the first quarter of 2019.

The Commission referred its findings regarding the inappropriate collection of unemployment benefits to the appropriate Labor Department and state law enforcement authorities for further review.

## Unspecified Payments to Associates or Relatives of Organized Crime Members

The SCI's review of financial records revealed documentary evidence that Daibes wrote personal checks totaling more than $100,000 over four years to family members of a now deceased organized crime figure. Multiple witnesses told the Commission the late mob member was a semi-regular visitor at the developer's former office at 1000 Portside Drive in Edgewater. To obtain more information about this financial relationship, the SCI subpoenaed Daibes and one of the individuals who received the payments to appear before the Commission to answer questions under sworn testimony regarding the nature of the payments. In response to every

27

question posed by SCI counsel regarding these payments, Daibes and the other individual chose to invoke their Fifth Amendment rights against self-incrimination. The following is a summary of the findings made by the SCI regarding the payments:

- Daibes wrote more than a dozen personal checks for unspecified payments totaling more than $100,000 to the son and daughter-in-law of a high-ranking Genovese crime family member who was a key operative in an illegal gambling ring run by the organized crime group in northern New Jersey in the 2000s.

- The checks issued between 2016 and 2019 were for amounts ranging from $1,500 to $50,000.

- The son previously worked for several Daibes-owned entities. The Commission found some of the wages he received from Daibes' businesses between 2014 and 2016, totaling $113,000, appeared unreported to the state Department of Labor.

\*       \*       \*

The Commission also found Daibes provided free housing for 13 years at one of his luxury Edgewater properties for the husband of a former councilwoman, a financial perk worth hundreds of thousands of dollars.[26] Robert Fischetti was not only married to a local government official, but he also happens to be a longtime Genovese crime family associate who was involved in illegal gambling for decades.

---

[26] Fischetti's wife, Duane, served on the Edgewater Council from 2015 to 2019. Fischetti testified that he and his wife have lived separately for decades. Duane Fischetti's son Robert Travers is the Edgewater Borough Attorney.

Fischetti has been linked to mob-affiliated illegal gambling activity for decades, running numbers in the 1960s before becoming a significant gambling operative in Hudson and Bergen counties in the 2000s. He served a prison term for extortion during the 1980s and served another term for contempt and related charges in the 1990s.

In sworn testimony, Fischetti, now in his 80s, told the Commission his relationship with Daibes began forty years ago when the developer was a young man who sometimes visited an Italian restaurant he once owned in Edgewater. At that time, he said Daibes was working as a bar back at the nearby Binghamton's ferryboat restaurant owned by developer James Demetrakis. Fischetti testified the two never conducted any business together – either legitimate or unlawful – but became "friendly."

Fischetti also attributed his arrangement with Daibes that allowed him to live rent-free for more than a decade to friendliness. He told the SCI: "Well, we became very friendly. He knew things weren't good for me, so he said, you know, don't worry about it…."

Fischetti testified he never paid for rent after moving into a swank apartment owned by Daibes on Edgewater's Hudson River Gold Coast from 2005 until 2018. Instead, a Daibes entity paid his rent. A review of records from Waterside Construction uncovered nearly $170,000 in checks written from the account between 2014 and 2018 alone to the Riello, formerly St. Moritz. Some checks included a written notation indicating the funds were rent payments for Fischetti's apartment.[27] The payments from Daibes' Waterside Construction stopped not long after the SCI issued a subpoena inquiring about the expenditures.

---

[27] Commission testimony revealed both Robert Fischetti and an Edgewater councilman often dined for free at Le Jardin.

# *Referrals and Recommendations*

In addition to the referrals already made to the Office of the Attorney General of New Jersey, the United States Attorney for the District of New Jersey and the New Jersey State Department of Labor and Workforce Development, the Commission refers the entirety of its findings to those agencies and the New Jersey Department of the Treasury, Division of Taxation, the New Jersey Department of Environmental Protection, the United States Internal Revenue Service, United States Department of Labor and the New Jersey Housing and Mortgage Financing Authority, for whatever action is deemed appropriate.

• • •

## 1.  Strengthen the Local Government Ethics Law

When the Local Government Ethics Law was enacted in 1991, the Commission applauded it for shining a light on the financial arrangements of local officials and setting basic standards for ethical conduct. Although the SCI mostly praised the law in the September 1992 *Local Government Corruption* report, it noted several areas where it did not go far enough and needed further fine-tuning regarding its scope, oversight and penalties for violations. Despite the Commission's recommendations to make the law more effective, as well as those from other reform-minded advocates, the law has remained substantially unchanged since it took effect three decades ago. Some municipalities and other government entities have adopted more restrictive ethics codes or created local boards to address ethics matters. Yet, little has occurred to comprehensively, uniformly and consistently address ethical concerns on the local level.

### *Expand Financial Disclosure*

- Local officials who are professional service providers or conduct business with firms seeking public contracts should be required to identify any clients who paid them or their firms more than $10,000 in annual fees on their annual financial disclosure statement.

### *Mandatory Ethics Training*

- Unlike counterparts serving in state government and some other public entities, municipal employees and local government officials do not undergo ethics training. The Commission recommends mandatory ethics training for all local public employees and elected officials. Online learning modules and webinars are now widely used in the private sector and across government in New Jersey to provide training, removing obstacles associated with in-person sessions, extending the reach of the content to a broader audience and making it available on demand. The state Division of Local Government Services already uses this technology through a webinar to assist individuals in online filing of their financial disclosure forms.

### *Increase Penalties for Violators*

- In the September 1992 *Local Government Corruption* report, the Commission noted that fines for violations of the newly enacted Local Government Ethics Law, set at "not less than $100 nor more than $500," should be increased. Thirty years later, the fines for violations remain unchanged. In contrast, any

state officer or employee found guilty of violating the New Jersey Conflicts of Interest Law or an agency Code of Ethics can be fined between $500 and $10,000 and/or suspended from office or employment for one year for each violation. Further, the State Ethics Commission, which oversees ethics issues in the Executive Branch, can also order restitution, demotion, censure or reprimand for an ethics violation. The Commission recommends increasing the fines to align with the law that governs ethics for state officers and employees

## 2.  Create a Conflicts of Interest Law for Local Government

The Commission recommends the creation of a conflicts of interest law for local government employees and elected officials similar to the New Jersey Conflicts of Interest Law that applies to State and Legislative branch employees. That law explicitly defines conduct that is prohibited for public employees as well as circumstances that present potential conflicts of interest and merit public disclosure. In lieu of creating a separate law specifically applicable to local government, New Jersey legislators should consider expanding the existing conflicts of interest law to include municipal employees and officials.

## 3.  Improve Environmental Site Remediation Oversight

The Site Remediation Reform Act was enacted in 2009 to expedite cleanups of environmentally contaminated sites. It enabled Licensed Site Remediation Professionals (LSRPs) to step in for the DEP to manage the day-to-day oversight of site cleanups. The law was significantly updated in 2019, adding numerous changes in responsibility for LSRPs and, in most

cases, reducing the circumstances when the State may take direct oversight of sites, if a project is on time and advancing appropriately. According to the DEP, the Site Remediation and Waste Management Program has successfully restored nearly 60,000 contaminated properties to productive use since its inception.

The Commission recommends changes to the program's management to strengthen and protect it from manipulation. The DEP should establish clear rules concerning the LSRPs' duties and clarify that the environmental professional holds authority over all cleanup activities at the site as a state government representative. Further, any funds designated for LSRPs for a specific project should be kept in a trust fund controlled by a neutral third party or the DEP until remediation is complete. This arrangement essentially creates a firewall removing the payment mechanism from the party that hired the LSRP, eliminating any misconception that the environmental professionals are accountable to the hiring entity rather than serving in their intended role as a stand-in for state regulators.

### 4.  Study State Supervision of Affordable Housing Mandates

The findings in this investigation demonstrate that affordable housing mandates and associated public funding mechanisms are vulnerable to manipulation and abuse. Since 2015, no state oversight mechanism has existed to oversee municipalities' legal obligation to provide their fair share of affordable housing in New Jersey. Before that time, the Council on Affordable Housing (COAH) administered the state's affordable housing mandate. However, the New Jersey Supreme Court removed its authority after COAH failed to meet court-imposed deadlines updating the number of affordable units each municipality needed to provide. That action came

following years of political infighting at the local and state levels and legal battles over the affordable housing rules. The courts now approve plans from towns seeking to demonstrate compliance with affordable housing mandates.

While this arrangement has moved New Jersey forward in meeting affordable housing obligations, it provides no administrative oversight to guide local government bodies in the process, hold them accountable for following the rules or to ensure the units are actually built. The Commission recommends the creation of a task force to study whether New Jersey should re-establish state oversight for affordable housing-related issues. Members of the task force should include local and state government representatives, housing advocates, land use, planning and zoning authorities, environmental experts and others with knowledge and expertise in affordable housing-related issues.